**Electronically Filed
Intermediate Court of Appeals
CAAP-11-0000377
22-DEC-2015
09:42 AM**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---oOo---

HUI MAKA'AINANA A KALAWAHINE, Appellant-Appellee,
vs.
HAWAIIAN HOMES COMMISSION; JOBIE M.K. MASAGATANI,
in her capacity as Chairperson of the Hawaiian Homes
Commission and the Director of the Department of
Hawaiian Home Lands; WILLIAM KĀHELE RICHARDSON,
MICHAEL P. KAHIKINA, RENWICK V.I. TASSILL,
DOREEN NĀPUA CANTO, GENE ROSS DAVIS, KATHLEEN PUAMAE'OLE CHIN,
WALLACE A. ISHIBASHI, and DAVID B. KA'APU[1]/, in their capacities
as members of the Hawaiian Homes Commission; and
the DEPARTMENT OF HAWAIIAN HOME LANDS,
Appellees-Appellants

CAAP-11-0000377

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 08-1-1855-09)

DECEMBER 22, 2015

NAKAMURA, CHIEF JUDGE, AND FUJISE AND LEONARD, JJ.

OPINION OF THE COURT BY NAKAMURA, C.J.

INTRODUCTION

I.

The Kalawahine Streamside Project (Kalawahine Project)
is a planned residential homestead community located on lands

---

[1]/ Pursuant to Hawai'i Rules of Appellate Procedure Rule 43(c)(1) (2010),
the current Chairperson and members of the Hawaiian Homes Commission have been
substituted as parties for the former Chairperson and members whom they
succeeded.

owned by the Department of Hawaiian Home Lands (DHHL). The Kalawahine Project involved the construction of approximately thirty-three single-family homes and fifty-four duplexes and also includes common areas for residents. The Kamehameha Investment Corporation (KIC), a private developer, developed the Kalawahine Project pursuant to an agreement with DHHL.

Qualified applicants on DHHL's waiting list entered into a sales contract with KIC to purchase their residence and entered into a homestead lease agreement with DHHL for the underlying land. In their sales contract with KIC, Kalawahine Project residents agreed to be bound by the Kalawahine Project's Declaration of Covenants, Conditions and Restrictions (DCCRs). The Kalawahine Project residents also agreed to be bound by the DCCRs as part of their lease agreement with DHHL. The DCCRs imposed conditions and restrictions on the residents' use and occupancy of their residences and established a homeowners' association called the Kalawahine Streamside Association (Association), of which all beneficial owners of the leasehold interest in any residential lot were members, to manage, operate, and maintain the Kalawahine Project.

Hui Maka'ainana a Kalawahine (HM) is a non-profit community-based organization comprised of certain Kalawahine Project residents. Approximately five years after members of HM had purchased residences and acquired homestead leases from DHHL in the Kalawahine Project, HM and members of its board of directors filed a petition, and later an amended petition, with the Hawaiian Homes Commission (HHC). In their amended petition, the petitioners sought a declaratory ruling that the DCCRs are void because DHHL had incorporated them into the Kalawahine Project residential leases without first prescribing administrative rules. The petitioners asserted that Section 207.5 of the Hawaiian Homes Commission Act, 1920, Act of July 9,

2

1921 (HHCA)[2] required DHHL to prescribe rules before imposing the DCCRs as conditions of the Kalawahine Project residential leases.

Following a contested case hearing, a hearings officer rejected the petitioners' arguments. The hearings officer recommended that the HHC rule that HHCA § 207.5 did not apply to the Kalawahine Project, that DHHL therefore was not required to prescribe rules before incorporating the DCCRs into the Kalawahine Project homestead leases, and that DHHL acted appropriately in incorporating the DCCRs into such leases. The HHC adopted the hearings officer's Findings of Fact, Conclusions of Law, and Recommended Decision and Order, denied the amended petition, and dismissed the matter. HM appealed to the Circuit Court of the First Circuit (Circuit Court). The Circuit Court reversed the HHC's decision and declared the DCCRs void.

II.

Appellees-Appellants the HHC, its Chairperson and members, and DHHL (collectively, DHHL) appeal from the Final Judgment entered by the Circuit Court.[3] On appeal, DHHL argues that the Circuit Court erred in concluding: (1) that HHCA § 207.5[4] applies to the Kalawahine Project; and (2) that DHHL was therefore required to comply with the rulemaking requirements of HHCA § 207.5 before incorporating the DCCRs into homestead leases granted to Kalawahine Project residents. DHHL contends that HHCA § 207.5 does not apply to the Kalawahine Project because the

---

[2] The HHCA, Pub. L. 67-34, 42 Stat. 108, is *reprinted in* 1 Hawaii Revised Statutes (HRS) 261 (2009). Unless otherwise indicated, we will cite to the HHCA as it appears in 1 HRS (2009).

[3] The Honorable Eden E. Hifo issued the orders at issue in this appeal and the Honorable Virginia Lea Crandall issued the Final Judgment.

[4] HHCA § 207.5 provides:

**Housing development.** The department is authorized to develop and construct single-family and multifamily units for housing native Hawaiians. The method of disposition, including rentals, as well as the terms, conditions, covenants, and restrictions as to the use and occupancy of such single-family and multifamily units shall be prescribed by rules adopted by the department pursuant to chapter 91.

Project was developed pursuant to HHCA § 220.5.[5] DHHL further contends that it properly issued the homestead leases for the Kalawahine Project pursuant to HHCA § 207(a),[6] which DHHL asserts permits it, without promulgating rules, to impose conditions, such as DCCRs, on residential lot leases. Accordingly, DHHL argues that the DCCRs are valid and enforceable conditions of the homestead leases it issued for the Kalawahine Project.

DHHL notes that if HM is correct that HHCA § 207.5 requires DHHL to promulgate rules in order to impose the DCCRs as conditions of the Kalawahine Project's homestead leases, then the validity of the sales contracts under which HM members purchased

---

[5] HHCA § 220.5 provides in relevant part:

**Development by contract; development by project developer agreement.** (a) Notwithstanding any law to the contrary, the department is authorized to enter into and carry out contracts to develop available lands for homestead, commercial, and multipurpose projects; . . . .

(b) Notwithstanding any law to the contrary, the department is authorized to enter into project developer agreements with qualified developers for, or in connection with, any homestead, commercial, or multipurpose project, or portion of any project; . . . .

. . . .

(f) Whenever the department enters into a project developer agreement to develop a homestead project, the department shall provide for the purchase of the completed project or that portion of a completed project developed for disposition to native Hawaiians, and shall dispose of the lands in accordance with this Act; provided that the project developer agreement shall not encumber any existing homestead lease in the project area.

. . . .

(h) The department is authorized to adopt rules in accordance with chapter 91, Hawaii Revised Statutes, to implement and carry out the purposes of this section.

[6] HHCA § 207, provides in relevant part:

**Leases to Hawaiians, licenses.** (a) The department is authorized to lease to native Hawaiians the right to the use and occupancy of a tract or tracts of Hawaiian home lands within the following acreage limits per each lessee: . . . (3) not more than one acre of any class of land to be used as a residence lot; . . . .

4

their homes would be called into question. HHCA § 207.5 requires DHHL to prescribe rules for the "method of disposition" as well as "the terms, conditions, covenants, and restrictions as to the use and occupancy" of single-family and multifamily units falling within the scope of HHCA § 207.5. Just as DHHL did not prescribe rules regarding the DCCRs, it did not prescribe rules regarding the method of disposition of units in the Kalawahine Project. DHHL asserts that HM's argument, if taken to its logical conclusion, would require invalidation of the sales contracts under which HM members acquired their residences.

DHHL alternatively argues that even if the DCCRs are invalid conditions of the Kalawahine Project homestead leases because DHHL should have promulgated rules before incorporating the DCCRs into the leases, the Kalawahine Project residents agreed to be bound by the DCCRs in their sales contracts with KIC. Accordingly, DHHL asserts that independent of the homestead leases, the DCCRs remain enforceable by the Association pursuant to Hawaii Revised Statutes (HRS) Chapter 421J, which governs planned community associations.

III.

As explained in greater detail below, we conclude that HHCA § 207.5 applies to the Kalawahine Project and that DHHL should have promulgated administrative rules before incorporating the DCCRs into the homestead leases issued to the Kalawahine Project residents. We further conclude that independent of the homestead leases, the Kalawahine Project residents are bound by the DCCRs pursuant to their sales contracts with KIC, and that the DCCRs, which are intended to benefit the entire planned community, remain subject to enforcement by the Association. Accordingly, we affirm the Circuit Court's Final Judgment to the extent that it vacated the decision of the HHC and declared that under HHCA § 207.5, DHHL was required to promulgate rules before incorporating the DCCRs into the homestead leases issued to the Kalawahine Project residents. We vacate the Circuit Court's

5

Final Judgment to the extent that it declared that the DCCRs are invalid and not subject to enforcement by the Association.

Under the circumstances of this case, equitable remedies may need to be fashioned to address DHHL's failure to promulgate rules as required by HHCA § 207.5. The remedies ultimately chosen must take into account their impact on those who relied upon or are affected by the actions taken by DHHL without promulgating rules required by HHCA § 207.5. On remand, the Circuit Court and the HHC should consider whether equitable remedies, including interim measures pending DHHL's promulgation of rules pursuant to HHCA § 207.5, are necessary and appropriate in light of this court's decision.

BACKGROUND

I.

DHHL entered into a development agreement with KIC to develop and construct the Kalawahine Project, a planned residential homestead community consisting of approximately thirty-three single-family homes, fifty-four duplex units, and common areas.[7] Pursuant to the development agreement, KIC drafted the DCCRs, which created the Association to manage and maintain the Kalawahine Project.

Prior to construction of the homes, KIC sent letters to certain applicants on DHHL's homestead waiting list, informing them of the lot selection process for the Kalawahine Project. A draft copy of the DCCRs was attached to these letters. Selected applicants then entered into a "Deposit Receipt and Sales Contract" (Sales Contract) with KIC for the construction and purchase of homes in the Kalawahine Project.[8] Each Sales Contract between KIC and the selected applicants provided that

---

[7] The common areas include walking trails and park areas, a pavilion, an imu and picnic area, portions of Kanaha Stream, and open areas.

[8] The residents of the Kalawahine Project purchased the residential units from KIC pursuant to the Sales Contract and separately leased the underlying property from DHHL for $1 per year.

everyone purchasing homes in the Kalawahine Project would be subject to the DCCRs as follows:

> **DECLARATION.** Buyer acknowledges that the Declaration[9/] provides that all owners in the Project are subject to the Declaration, copies of which have been received by the Buyer. The Declaration provides, among other things, that (a) Buyer automatically becomes a member of the Association upon issuance of the Lease to Buyer, (b) that Buyer must pay assessments to the Association (including assessments for upkeep maintenance and repair of certain common areas within the Project), (c) that no construction, or alteration of improvements on the Property is permitted except in accordance with certain design rules and guidelines, and (d) that the Property is subject to certain restrictions o[n] use, all as more fully set forth in the Declaration. The Declaration also provides that initiation and monthly or other periodic assessments must be paid.

On March 28, 2000, the DCCRs were recorded in the Bureau of the Conveyances of the State of Hawaiʻi. The purposes of the DCCRs are to "enhance the orderly and proper development and use" of the planned community, "to protect the value, desirability and attractiveness of the [Kalawahine] Project, and to promote the quality of improvements and uses of the [planned community] as a whole[.]" The DCCRs provide that its covenants, conditions, and restrictions create mutual equitable servitudes upon each lot in favor of every other lot in the planned community and create reciprocal rights and obligations among all persons and entities having any right, title, or interest in and to any lot within the planned community.

The DCCRs established the Association and imposed various duties and obligations on the Association to be performed for the maintenance and improvement of the Kalawahine Project, including the responsibility for managing and maintaining the common areas. The DCCRs also empowered the Association to, among other things: (1) levy assessments on members of the Association to cover the Association's costs and expenses in performing its

---

9/ The Sales Contract defined the term "Declaration" to mean "the Declaration of Covenants, Conditions and Restrictions for Kalawahine Streamside, recorded or to be recorded in the Office of the Assistant Registrar of the Land Court of the State of Hawaii and/or Bureau of Conveyances of the State of Hawaii, as the same has been or may hereafter be supplemented or amended.

duties; and (2) adopt and amend rules to govern the use of the common areas and to govern other matters, such as the collection and disposal of refuse and the maintenance and preservation of the Kanaha Stream. The Articles of Incorporation for the Association were filed with the Department of Commerce and Consumer Affairs on April 4, 2000, and the Association adopted By-laws on May 1, 2000.

In addition to entering into Sales Contracts with KIC for the construction and purchase of their homes, the residents of the Kalawahine Project entered into homestead leases with DHHL for the lots underlying their homes. The homestead leases signed by the Kalawahine Project residents specified that the leases were subject to the terms and conditions of the DCCRs.

II.

HM is a non-profit community-based organization of Kalawahine Homestead residents "formed to increase and improve community involvement and awareness within Hawaiian Homestead communities."[10] Approximately five years after the initial Kalawahine Project residents signed their leases, HM and Kahealani Keahi-Wood, Auli'i Hirahara, Allennette Stender, Edward Simeona, and Christopher Wood, as individuals and members of HM's Board of Directors, filed a petition for a declaratory ruling before the HHC.

The petition sought a declaratory ruling from the HHC on: (1) whether DHHL violated HHCA § 207.5 in subjecting the lease of residential lots in the Kalawahine Project to the DCCRs without first prescribing administrative rules; and (2) whether the DCCRs are void based on DHHL's failure to comply with HHCA § 207.5. In response to the petition, the HHC scheduled a contested case hearing. Because a determination of the issues presented in the petition would affect homeowners in the Kalawahine Project and may also affect homeowners in several

---

[10] In its opening brief, DHHL assert that "HM is comprised of only five residents of the Kalawahine Project."

other homestead subdivisions with declarations of covenants, conditions, and restrictions, the HHC directed that homestead associations with declarations of covenants, conditions, and restrictions be informed of the pending contested case and given the opportunity to intervene. The Association and the Princess Kahanu Estates Association requested and were granted permission to intervene in the contested case hearing.

The petitioners subsequently filed an amended petition for declaratory ruling,[11] which added to the questions presented a challenge to the HHC's permitting the homeowners associations to intervene. The amended petition sought relief from the HHC, including declarations that: (1) DHHL violated HHCA § 207.5 in subjecting the lease of residential lots in the Kalawahine Project to the DCCRs without first prescribing administrative rules; (2) the Kalawahine Project DCCRs are void based on DHHL's failure to comply with HHCA § 207.5; (3) Kalawahine Project residents shall not be subject to lease cancellation for failure to pay monthly maintenance assessments, fees, fines or penalties; (4) all unexpended maintenance assessments shall be returned to residents; and (5) DHHL must prescribe rules as required by HHCA § 207.5 before incorporating any covenants, conditions and/or restrictions on any lease.

The HCC held a contested case hearing on the amended petition before Hearings Officer Jim Nicholson (Nicholson). Following the hearing, Nicholson issued Findings of Fact, Conclusions of Law, and a Recommended Decision and Order (Hearings Officer's Recommended Decision and Order) which recommended the denial of the petitioners' claims for relief. In pertinent part, the Hearings Officer concluded that: (1) the homestead leases for the Kalawahine Project were not issued pursuant to HHCA § 207.5, but rather were issued pursuant to HHCA § 207(a); (2) the DHHL is authorized to place conditions and

---

[11] The petitioners for the amended petition were the same as the original petition except that Auli'i Hirahara was not named as a petitioner in the amended petition.

restrictions on homestead leases issued pursuant to HHCA § 207(a) without engaging in administrative rulemaking; and (3) the Association was appropriately established under HRS Chapter 421J. The HHC subsequently issued "Findings of Fact, Conclusions of Law, Decision and Order; Order Denying Petition and Dismissing Matter" (HHC's Decision and Order). The HHC's Decision and Order adopted the Hearing Officer's Recommended Decision and Order, denied the amended petition, and dismissed the matter.

III.

HM appealed the HHC's Decision and Order to the Circuit Court. The Circuit Court filed an initial order reversing the HHC's Decision and Order. In its initial order, the Circuit Court ruled that HHCA § 207.5 applied to the Kalawahine Project; that HHCA § 207.5 required DHHL to engage in rulemaking before incorporating the DCCRs into the homestead leases that DHHL issued to the Kalawahine Project residents; and that DHHL had failed to engage in such rulemaking. The Circuit Court therefore reversed the HCC's Decision and Order and determined that violation of the DCCRs would not be a basis for revoking the leases issued to the Kalawahine Project residents. The Circuit Court, however, further noted that the DCCRs were separately incorporated into the Sales Contracts between the Kalawahine Project residents and KIC and were consistent with HRS Chapter 421J, which governed planned community associations. The Circuit Court concluded that its ruling did not affect the Association's ability to enforce the DCCRs pursuant to HRS Chapter 421J.

HM moved for reconsideration/clarification of the Circuit Court's initial order. HM requested that the Circuit Court amend its initial order to declare that the DCCRs are invalid altogether and therefore could not be enforced by the Association. In the alternative, HM requested that the Circuit Court amend its initial order to make clear that it was not

10

ruling on whether the DCCRs could be enforced by the Association. The Circuit Court granted HM's motion for reconsideration/ clarification and issued an amended order, which omitted the paragraph in its initial order that referred to HRS Chapter 421J and the Associations's ability to enforce the DCCRs.  In its amended order, the Circuit Court reversed the HHC's Decision and Order and declared "the [DCCRs] void."

The Circuit Court entered its Final Judgment on April 5, 2011, in favor of HM on its first claim for relief (First Claim), which sought a declaration that the DCCRs should be declared void because DHHL violated HHCA § 207.5 by enacting and implementing the DCCRs for the Kalawahine Project without first promulgating rules under HRS Chapter 91.[12/]  This appeal followed.

.  DISCUSSION

I.

We must interpret several sections of the HHCA in order to determine whether DHHL was required to promulgate rules before incorporating the DCCRs into the homestead leases issued for the Kalawahine Project.  The sections at issue are: (1) HHCA § 207.5, which authorizes DHHL to develop and construct single-family and mutifamily units for housing native Hawaiians and requires that the method of disposition and the terms, conditions, covenants, and restrictions as to the use and occupancy of such units be prescribed by administrative rules; (2) HHCA § 220.5, which authorizes DHHL "to enter into and carry out contracts to develop available lands for homestead, commercial, and multipurpose

---

[12/] HM's appeal to the Circuit Court asserted three other claims for relief: DHHL violated HRS Chapter 91 by failing to engage in rulemaking procedures before enacting the DCCRs (Second Claim); DHHL breached their fiduciary duties by violating HHCA § 207.5 (Third Claim); and DHHL acted beyond the scope of their powers by allowing the Association and Princess Kahanu Estates Association to intervene in HM's petition (Fourth Claim).  The Circuit Court's Final Judgment dismissed HM's Second and Third Claims without prejudice because their resolution was unnecessary given the Circuit Court's ruling on the First Claim, and the Final Judgment entered judgment in favor of DHHL on HM's Fourth Claim.  The Final Judgment's resolution of HM's Second, Third, and Fourth Claims are not at issue in this appeal.

11

projects[.]"; and (3) HHCA § 207(a), which authorizes DHHL to lease to native Hawaiians land to be used as a residence lot.

As explained below, we conclude that under its plain language, HHCA § 207.5 applies to the Kalawahine Project. We further conclude that HHCA § 220.5 does not warrant deviating from HHCA § 207.5's plain language by reading an exclusion into HHCA § 207.5 for housing projects developed and constructed by DHHL in conjunction with a private developer. Accordingly, we hold that DHHL should have prescribed rules pursuant to HRS Chapter 91 before incorporating the DCCRs into the leases issued to residents of the Kalawahine Project.

A.

HHCA § 207(a) provides DHHL with the general authority "to lease to native Hawaiians the right to the use and occupancy of . . . Hawaiian home lands[,]" including "not more than one acre of any class of land to be used as a residence lot[.]" HHCA § 207(a).[13] A 1962 opinion issued by the Department of the Attorney General, State of Hawai'i, interpreted the HHCA as authorizing DHHL to lease land to native Hawaiians, but leaving the lessee with the responsibility of developing and improving the land. Attorney General's Opinion No. 62-9. As construed by the Attorney General's opinion, the HHCA did not authorize the DHHL to provide multi-unit dwellings or undertake multi-unit dwelling projects. Id.

HHCA § 207(a) was amended in 1984 to specifically authorize DHHL "to develop and construct multi-family units for housing native Hawaiians." 1984 Haw. Sess. Laws Act 27, § 1 at 67. The 1984 amendment further provided that "[t]he method of disposition, as well as the terms, conditions, covenants, and restrictions as to the use and occupancy of such multi-family units shall be prescribed by rules adopted by the department

_____

[13] The quoted language was also present in the HHCA § 207(a) that was in effect in 1962.

pursuant to chapter 91." Id. Thus, the 1984 amendment gave DHHL the specific authority to "develop and construct multi-family units for housing native Hawaiians[,]" but required rulemaking for "[t]he method of disposition, as well as the terms, conditions, covenants, and restrictions as to the use and occupancy of such multi-family units[.]" Id.

B.

In 1986, the HHCA was amended to add HHCA § 220.5. 1986 Haw. Sess. Laws Act 84, § 1 at 113-15. HHCA § 220.5 provides that "[n]otwithstanding any law to the contrary, [DHHL] is authorized to enter into and carry out contracts to develop available lands for homestead, commercial, and multipurpose projects[.]" HHCA § 220.5(a). "Homestead project" is defined to mean, in relevant part: "a project or that portion of a multipurpose project, including residential . . . uses designed and intended for disposition to native Hawaiians under this Act[.]" HHCA § 220.5(g). HHCA § 220.5 establishes procedures DHHL must follow in entering into, and requirements for, project developer agreements with a developer.

According to a committee report on Senate Bill 2319-86, which eventually became HHCA § 220.5 enacted in 1986, the purpose of the bill was "to amend the [HHCA], to authorize [DHHL] to develop lands by contract and by agreements with developers." H. Stand. Comm. Rep. No. 690-86, in 1986 House Journal, at 1326. The report stated that "this type of development would be for (1) homesteading purposes and (2) commercial purposes to generate income for [DHHL]" Id.

C.

In 1997, the HHCA was amended by creating HHCA § 207.5. 1997 Haw. Sess. Laws Act 196, § 1-2 at 368-69. Although established as a new section, HHCA § 207.5 largely consists of language carved out from HHCA § 207(a). Id. The language

previously added to HHCA § 207(a) in 1984[14] was removed from HHCA § 207(a) and placed into the newly-created HHCA § 207.5, and new language referring to single-family units and rentals was also added.  HHCA § 207.5, entitled "Housing development[,]" provides:

> The department is authorized to develop and construct **single-family and** multifamily units for housing native Hawaiians.  The method of disposition, **including rentals,** as well as the terms, conditions, covenants, and restrictions as to the use and occupancy of such **single-family and** multifamily units shall be prescribed by rules adopted by the department pursuant to chapter 91.

HHCA § 207.5 (emphases added).  HCCA § 207.5 added the above-emphasized references to "single-family and" and "including rentals" to the language previously added to HCCA § 207(a) in 1984; those were the only changes made to the provisions transferred from HHCA § 207(a) to the newly-created HHCA § 207.5. See 1997 Haw. Sess. Laws Act 196, § 1-2 at 368-69.

As referenced in committee reports, the purpose of the 1997 legislation was "to expand [DHHL's] authorization to develop and construct rental housing units for native Hawaiians to include single family units" and "[a]uthorize [DHHL] to undertake rental housing projects[.]"  S. Stand. Comm. Rep. No. 1826, in 1997 Senate Journal, at 1566; H. Stand. Comm. Rep. No. 186, in 1997 House Journal, at 1189.  Committees considering the 1997 legislation also found that "providing [DHHL] with more housing provision options would better suit the changing needs of its constituency and could expedite the process of placing more native Hawaiians in Department-sponsored housing projects."  S. Stand. Comm. Rep. No. 1114, in 1997 Senate Journal, at 1313.

---

[14] As previously noted, HHCA § 207(a) was amended in 1984 to add the following language:

> The department is authorized to develop and construct multi-family units for housing native Hawaiians.  The method of disposition, as well as the terms, conditions, covenants, and restrictions as to the use and occupancy of such multi-family units shall be prescribed by rules adopted by the department pursuant to chapter 91.

1984 Haw. Sess. Laws Act 27, § 1 at 67.

II.

A.

On appeal, DHHL argues that HHCA § 207.5, and its rulemaking requirements, do not apply to the Kalawahine Project because the Project was developed through a project developer agreement authorized under HHCA § 220.5. and involved residential lot leases issued pursuant to HHCA § 207(a).[15] In particular, DHHL contends that HHCA § 207.5 and HHCA § 220.5 are mutually exclusive and therefore HHCA § 207.5 does not apply to residences developed pursuant to a project developer agreement under HHCA § 220.5. We disagree with DHHL's argument.

B.

"When construing a statute, this court's foremost obligation is to ascertain and give effect to the intention of the legislature which is to be obtained primarily from the language contained in the statute itself." _University of Hawaiʻi v. Befitel_, 105 Hawaiʻi 485, 488, 100 P.3d 55, 58 (2004) (internal quotation marks and citation omitted). We conclude that the plain language of HHCA § 207.5 establishes that it applies to the Kalawahine Project and that DHHL was required to promulgate rules before incorporating the DCCRs as conditions of the homestead leases issued to Kalawahine Project residents.

HHCA § 207.5 provides:

> The department is authorized to develop and construct single-family and multifamily units for housing native Hawaiians. The method of disposition, including rentals, as well as the terms, conditions, covenants, and restrictions as to the use and occupancy of such single-family and multifamily units shall be prescribed by rules adopted by the department pursuant to chapter 91.

In this case, DHHL, in conjunction with private developer KIC, developed and constructed the Kalawahine Project. There is no dispute that the Kalawahine Project consists of and

_____

[15] There appears to be no dispute that if HHCA § 207.5 does not apply to the Kalawahine Project, then DHHL could have imposed conditions, including the DCCRs, on residential lot leases issued pursuant to HHCA § 207(a) for the Kalawahine Project without engaging in rulemaking.

contains more than eighty-five "single-family and multifamily units for housing native Hawaiians." Thus, the Kalawahine Project falls within the plain language of DHHL's authority under HHCA § 207.5 "to develop and construct single-family and multifamily units for housing native Hawaiians."

HHCA § 207.5 further provides that for "such single-family and multifamily units," "[t]he method of disposition, including rentals, as well as the terms, conditions, covenants, and restrictions as to the use and occupancy . . . shall be prescribed by rules adopted by [DHHL] pursuant to [HRS] chapter 91." The DCCRs which DHHL incorporated as conditions of the homestead leases it issued to Kalawahine Project residents clearly imposed "terms, conditions, covenants, and restrictions" on the residents' use and occupancy of their units. We therefore conclude that under the plain language of HHCA § 207.5, DHHL was required to prescribe rules pursuant to HRS Chapter 91 before incorporating the DCCRs as conditions of these leases.

C.

DHHL contends that HHCA § 207.5 only applies where DHHL develops and constructs single-family or multifamily housing units "on its own" and does not apply where DHHL develops and constructs housing units in conjunction with a private developer pursuant to a project developer agreement under HHCA § 220.5. However, there is nothing in the language of HHCA § 220.5 that purports to exempt DHHL's development and construction of single-family or multifamily housing units through project developer agreements from the requirements of HHCA § 207.5. Indeed, DHHL provides no explanation for why the Legislature would require DHHL to promulgate rules regarding the method of disposition and the terms and conditions for the use and occupancy of housing units developed by DHHL "on its own," but not for housing units developed by DHHL in conjunction with a private developer.

The general authorization provided to DHHL "to develop and construct" housing units under HHCA § 207.5 is most naturally and conventionally interpreted to encompass DHHL's development

16

and construction of housing units through a project developer agreement. DHHL does not provide any persuasive reason to deviate from this reading of the statute.

In its argument, DHHL cites to: (1) HHCA § 220.5(a), which states: "Notwithstanding any law to the contrary, [DHHL] is authorized to enter into and carry out contracts to develop available lands for homestead, commercial, and multipurpose projects[.]" (emphasis added); and (2) HHCA § 220.5(h) which authorizes but does require DHHL to adopt rules to implement and carry out the purposes of HHCA § 220.5. DHHL also relies on language in a committee report for the bill that added HHCA § 220.5, which stated that the bill "would provide DHHL with alternative methods to achieve its objectives in a timely and responsive manner." S. Stand. Comm. Rep. No. 393-86, in 1986 Senate Journal, at 943. We conclude that the foregoing provisions of HHCA § 220.5 and the committee report do not justify reading an unstated exclusion for housing projects developed through project developer agreements into HHCA § 207.5.

HHCA § 220.5 authorizes DHHL to enter into contracts to develop homestead, commercial, or multipurpose projects on DHHL lands. The purpose of authorizing DHHL to engage in development of commercial projects is to generate income for DHHL that would enable it to better fulfill its trust responsibilities. See S. Stand. Comm. Rep. No. 393-86, in 1986 Senate Journal, at 942-43. There is no conflict or inconsistency between the alternative methods that HHCA § 220.5 provides for DHHL to generate income and finance homestead projects and the application of HHCA § 207.5 to require DHHL to promulgate rules regarding the method of disposition and the conditions for use and occupancy of residential units. Accordingly, the prefatory "[n]otwithstanding any law to the contrary" language of HHCA § 220.5(a) does not exempt units developed through project developer agreements from the requirements of HHCA § 207.5. Similarly, DHHL does not provide any persuasive reason why DHHL's authority under HHCA

§ 220.5(h) to adopt rules to implement HHCA § 220.5 should exempt DHHL from the rulemaking requirements of HHCA § 207.5. Therefore, the foregoing provisions cited by DHHL do not demonstrate that the Legislature intended to exclude housing units for native Hawaiians developed through project developer agreements from the requirements of HHCA § 207.5.

D.

In summary, we conclude that the plain language of HHCA § 207.5 establishes that it applies to the Kalawahine Project. Under HHCA § 207.5, DHHL was required to prescribe rules pursuant to HRS Chapter 91 before incorporating the DCCRs as conditions of the leases issued to Kalawahine Project residents. Accordingly, DHHL violated HHCA § 207.5 by failing to promulgate rules before incorporating the DCCRs into theses leases.

We note that HHCA § 207.5 requires DHHL to prescribe rules for the "method of disposition" of single-family and multifamily units developed and constructed by DHHL as well as for "the terms, conditions, covenants, and restrictions as to the use and occupancy" of such units." (Emphasis added.) DHHL observes that "[j]ust as DHHL's administrative rules do not contain any provisions governing the drafting of DCCRs for single-family or multifamily housing units, they also do not contain any provisions governing how those single family or multifamily housing units are to be disposed of to native Hawaiians." Thus, DHHL's failure to promulgate rules pursuant to HHCA § 207.5 not only raises questions about the validity of the DCCRs incorporated into the homestead leases issued to Kalawahine Project residents, but also the Sales Contracts by which Kalawahine Project residents, including members of HM, acquired their units.

HM contends that we should rely on DHHL's failure to comply with the rulemaking requirements of HHCA § 207.5 to void the DCCRs (which they oppose), but not the Sales Contracts (which they favor). However, HM's arguments regarding DHHL's failure to comply with its rulemaking obligations apply to both situations.

18

HM cannot selectively rely on HHCA § 207.5's rulemaking requirements when they suit HM's purpose, but ignore the same requirements when they would be detrimental to HM.  In fashioning appropriate remedies, the actions taken by DHHL without prescribing rules as required by HHCA § 207.5, and affected individuals' reliance on such actions, will need to be considered.

### III.

DHHL argues that even if the DCCRs incorporated into the homestead leases for the Kalawahine Project are found to be invalid and not enforceable by DHHL (because DHHL failed to engage in rulemaking as required under HHCA § 207.5), the Kalawahine Project residents agreed to be bound by the DCCRs through their Sales Contracts with KIC.  DHHL therefore asserts that independent of the homestead leases, the DCCRs remain enforceable by the Association pursuant to HRS Chapter 421J, which governs planned community associations.  We agree.

### A.

Similar to other planned communities, the Kalawahine Project includes common areas for use by members of the community.  Such communities, by their nature, require a method of self-governance, typically in the form of a homeowners association comprised of residence owners, to ensure compliance with community rules and the collection of assessments to pay for common expenses that serve to benefit the community as a whole.

The Sales Contracts between KIC and all the Kalawahine Project residents who purchased homes incorporated the DCCRs and made the purchases subject to the DCCRs.  By entering into the Sales Contract, each resident/buyer agreed to be bound by the terms and conditions of the DCCRs.  The Sales Contracts specifically notified the buyers that pursuant to the DCCRs, "all owners in the [Kalawahine] Project [(i.e., residential owners with homestead leases)] are subject to the [DCCRs]"; that a buyer automatically becomes a member of the Association; that the buyer must pay assessments to the Association for such things as upkeep

and maintenance of common areas within the Kalawahine Project; and that the buyer will be subject to certain design rules and other restrictions on use.

The purposes of the DCCRs include enhancing the orderly and proper development and use of the Kalawahine Project, protecting the value, desirability, and attractiveness of the Project, and promoting the quality of improvements and uses of the planned community as a whole. In furtherance of these purposes, the DCCRs created the Association and gave it various duties and powers to manage, maintain, and improve the Kalawahine Project. The DCCRs establish a structure for self-governance by Kalawahine Project residents and create reciprocal rights and obligations shared by Kalawahine Project residents for their mutual benefit.

HM's decision to pursue declaratory relief apparently stemmed from the disagreement of HM's members with certain of the restrictions and conditions imposed by the DCCRs. However, the DCCRs themselves provide a mechanism for HM members who purchased residences, by virtue of their membership in the Association, to amend the DCCRs by obtaining an affirmative vote of two-thirds of the Association members.

B.

HRS Chapter 421J governs planned community associations in Hawai'i. DHHL argues, and we agree, that the Association satisfies the conditions for a valid planned community association under HRS Chapter 421J.

As noted, the DCCRs were incorporated into each Sales Contract between KIC and the Kalawahine Project residents. The DCCRs as well as the Articles of Incorporation for the Association were properly recorded, and the Association adopted its By-laws. For the benefit of the community as a whole, all the Kalawahine Project residents who purchased their homes through the Sales Contracts, including members of HM, agreed to be bound by the DCCRs, to become members of the Association, and to be subject to the authority granted to the Association.

20

With respect to the freedom to contract, the Hawai'i Supreme Court has recognized that,

> "In general, parties may contract as they wish, and courts will enforce their agreements without passing on their substance. The principle of freedom of contract is itself rooted in the notion that it is in the public interest to recognize that individuals have broad powers to order their own affairs by making legally enforceable promises."

City Exp. Inc., v. Express Partners, 87 Hawai'i 466, 470 n.4, 959 P.2d 836, 840 n.4 (1998) (citation and ellipsis points omitted; emphasis added). We conclude that independent of the homestead leases issued by DHHL, the DCCRs are subject to enforcement by the Association based on the Kalawahine Project residents' contractual agreement to be bound by the DCCRs.

C.

HM argues that the Association cannot be permitted to enforce the DCCRs pursuant to HRS Chapter 421J because HRS Chapter 421J conflicts with the HHCA. We disagree.

In support of its argument, HM cites Kepo'o v. Watson, 87 Hawai'i 91, 952 P.2d 379 (1988). In Kepo'o, the Hawai'i Supreme Court held that HRS Chapter 343, which requires the preparation of an environment impact statement before construction on certain projects, "does not significantly affect the land" and did not conflict with the HHCA. Kepo'o, 87 Hawai'i at 100, 102, 952 P.2d at 388, 390. In support of its decision, the supreme court, among other factors, noted that the effect of HRS Chapter 343 on Hawaiian home lands was incidental because HRS Chapter 343 "does not affirmatively require DHHL to use the land for any particular purposes." Id. at 101, 952 P.2d at 389. It also noted that HRS Chapter 343 "merely imposes procedural and informational requirements on DHHL projects[.]" Id.

Similar to HRS Chapter 343, HRS Chapter 421J establishes procedural requirements to facilitate the management of planned communities and does not affirmatively require DHHL to use Hawaiian home lands for any particular purpose.

HM also cites HHCA § 206 in support of its argument that HRS Chapter 421J conflicts with the HHCA. HHCA § 206 provides: "The powers and duties of the governor and the board of land and natural resources, in respect to lands of the State, shall not extend to lands having the status of Hawaiian home lands, except as specifically provided in this title." This section is inapposite. Enforcement of the DCCRs by the Association does not implicate the powers and duties of the Governor or the Board of Land and Natural Resources. We conclude that HRS Chapter 421J does not conflict with the HHCA.

IV.

Based on the foregoing, we conclude that HHCA § 207.5 applies to the Kalawahine Project, and therefore, DHHL should have promulgated administrative rules before incorporating the DCCRs into the homestead leases issued to the Kalawahine Project residents. We further conclude that independent of the homestead leases, the Kalawahine Project residents are bound by the DCCRs pursuant to their Sales Contracts with KIC, and that the DCCRs, which are intended to benefit the entire planned community, remain subject to enforcement by the Association. Accordingly, we affirm the Circuit Court's Final Judgment to the extent that it vacated the decision of the HHC and declared that under HHCA § 207.5, DHHL was required to promulgate rules before incorporating the DCCRs into the homestead leases issued to the Kalawahine Project residents. We vacate the Circuit Court's Final Judgment to the extent that it declared that the DCCRs are invalid and not subject to enforcement by the Association.

Under the circumstances of this case, equitable remedies may need to be fashioned to address DHHL's failure to promulgate rules as required by HHCA § 207.5. DHHL's violation of the rulemaking requirements of HHCA § 207.5 has implications that go beyond the effect of DHHL's violation on its ability to enforce the DCCRs against HM members. As noted, HHCA § 207.5 requires DHHL to prescribe rules for the "method of disposition" as well as the terms and conditions for the use and occupancy of

22

single-family and multifamily units.  Therefore, DHHL's failure to promulgate rules as required by HHCA § 207.5 raises questions about the Sales Contracts through which Kalawahine Project residents acquired their residences.  The impact on those who relied upon or are affected by the actions taken by DHHL without complying with HHCA § 207.5's rulemaking requirements must be considered in fashioning appropriate remedies.  Further development of the record is required to address these matters.  On remand, the Circuit Court and the HHC should consider whether equitable remedies, including interim measures pending DHHL's promulgation of rules pursuant to HHCA § 207.5, are necessary and appropriate in light of this court's decision.

CONCLUSION

We affirm in part and vacate in part the Circuit Court's Final Judgment, and we remand the case for further proceedings consistent with this Opinion.

On the briefs:

Diane K. Taira
Matthew S. Dvonch
Deputy Attorneys General
for Appellees-Appellants

Moses K.N. Haia
Alan T. Murakami
(Native Hawaiian Legal
Corporation)
for Appellant-Appellee

*Craig H. Nakamura*